ARCH Z. STEVENS V. THE STATE.

No. 22169. Delivered June 10, 1942.
Rehearing Denied October 21, 1942.

The opinion states the case.

*M. Neal Smith,* of Longview, and *Baskett & Parks,* of Dallas, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was convicted of theft and assessed a penalty of two years in the penitentiary.

The indictment alleges the theft of $6,500.00 from Crafton Reid on the 3rd day of September, 1941. The evidence from

the standpoint of the State is to the effect that both appellant and the prosecuting witness reside near Palestine in Anderson County. Prior to the date of the theft they, with two other parties, became involved in a poker game in which the prosecuting witness lost and appellant won $150.00. The other parties also claimed to have lost a larger amount to appellant. After this game, appellant and the prosecuting witness met at an eating place and agreed to go on some kind of mission to Kilgore in Gregg County. After drinking there appellant said he had to go to Dallas to see a man and agreed to bear all expenses if the prosecuting witness would go with him. This man is admittedly the chief actor in the theft. Reaching Dallas, they spent the rest of the night at a tourist court. Early the next morning appellant left the prosecuting witness at the court and promised to return in about two hours, but did not do so until about 4:30 in the afternoon. At that time he reported to the witness that he had found the fellow that he wanted to see and asked the witness to go with him and talk to the man. After some conversation they went to his cottage and the stranger told them that he had something he wanted to show them. He took them to a cabin at another tourist court, where they witnessed a slight of hand performance by which the stranger claimed to have raised a $1.00 bill to a $5.00 bill. Reid was interested. The stunt was attractive, and it began working on his mind in a most unusual way. The performance was described in the minutest detail. Appellant and Reid then went to eat at the expense of the appellant, who continually talked about the mysterious performance which they had seen. They checked out and went to their homes near Palestine. On the way and during their sojourn together appellant asked the witness "time and time again if I had any and could get any money." Appellant said he had $40,000 in money and wanted Reid to get all he could so that they could have this performer to duplicate it for them. They met again at Kilgore, in Gregg. County, the scene of the crime charged. The Dallas man was there. Two quiet cottages near the corner of the tourist court were retained. Reid was afraid; his eyes were unnatural, according to his sister. As he now views it, he was under a spell. His sister thinks so, too. The only evidence of anything operating upon him, however, was the impelling personality and the over-powering persuasion of the appellant on the alluring subject of money. Appellant said, "If you will get some more money and loan us the money, * * * you needn't have anything to do with it; and I said, "I didn't care to have anything to

do with counterfeit money. He said he could handle all he could get of that," was testified to by Reid. This, it seems, referred to the conversations prior to the final meeting of the three in Kilgore. The deal is described as being promoted by both appellant and the Dallas man. No objection is made to this testimony and there is no specific denial of it. The procedure by which Reid borrowed $1,500 from Roy Laird, secured $1,000 and then $4,000 from his mother, who lives in the oil field between Kilgore and Gladewater, is immaterial to the transaction. It adds interest to the story and as such emphasizes the oft-repeated declaration that "a fool is born every minute." He got the $6,500 and he lost it. Even the appellant testifies to that. The process is unfolded in the statement of facts. First, appellant and his Dallas friend, whom he met in a pool hall at Longview sometime prior to the trip to Dallas, went into one of the cabins and ostensibly engaged themselves in placing appellant's $40,000 in $100.00 bills in the money press which was to be used to duplicate it. They instructed Reid to stay out in front, probably as a watchman, while they placed the money in. Reid then produced his sixty-three $100.00 bills and four $50.00 bills and watched the counterfeiter wet each piece and place it between the boards, alternating with a piece of paper, after using some kind of chemical treatment or process. (This was a very precious chemical. It was said no more of it could be obtained). With his own eyes he saw each piece go in, and his confidence in that fact was unshaken to the very end. Four hours it was to remain there, after which it was to be returned to him, together with $3,250.00 of good money, not the duplicated or counterfeit kind. Under a spell, influenced by some drug or what, nevertheless, Reid was cautious that his clean hands touch not other than the genuine made in Washington. No brief can be held for Reid, and not for his relatives, for they were probably informed as they furnished him the money, and none need be presented in this case, for only the jury has the right to consider his connection in the whole affair as they passed upon his credibility as a witness. The money was in. Appellant's $40,000 (he says only $10,000 of his gambling money which he had in his pocket for several days) and Reid's $6,510. A $10.00 bill was on top and it was visible. We presume it would be called "confidence money" because it inspired confidence that the rest of it was there too, though it had been placed by a skillful hand between the other papers of exactly the same size so that not an edge would show. The boards were then clamped together by means

of screws, not accurately described. It was placed in the sink under hot running water, where it was to remain for a time. To complete the process, four hours would be required. Reid's only affliction was the anxiety of four hours of waiting, and this was lonely, very lonely, because appellant and the counterfeiter hastened to look after other business uptown or somewhere. They got lost from each other, and the appellant had to stay about two hours. Returning he found Reid in the room in darkness. He was afraid to turn on the lights with all of that money there on his hands; and the responsibility of looking after $46,510.00, which he was certain he had, was a weight on his nervous system. He was glad to see appellant, who became skeptical because of the disappearance of the third man, but Reid was not. He had seen the money placed there and he knew it was still there. They locked this device with the money in the back end of his car while they went to the County Line Sandwich Shop to fill in the time, as well as their stomachs, together, but the third man never returned. This was strange indeed. Appellant became more skeptical but not the credulous Reid, for he knew the money was there. Appellant must have searched a long time to find this one: The boys along Hickory Creek had a good season when they found a fellow to hold the "snipe sack" even though he didn't have enough cotton-picking money to pay for the soda pop. The device was unloosed and Reid says, "Don't you see this $10.00. I told you it was all right." Then appellant loosed a tirade on the absconding Hale, as Stevens had known him, for only the $10.00 bill was to be found. Consolation for Reid was found in the professed undying friendship of Stevens who shook his hand and said, "We are just like brothers, we will be just like brothers now, we have lost this." Words of affection were spoken as they parted, but "All are not friends that speak us fair." Stevens left immediately in search of Hale. He took the boards that had been used as a device and, somewhere along the road to Dallas, threw them into a ditch so as to be certain that they were not produced in court. He did not want to see them any more. He wanted Hale and his $10,000 but he never reported the affair to an officer, and only in court does he come to tell the sad story of how a fool and his money parted. Reid was not the professional gambler nor the good loser which the appellant professed to be. It was embarrassing but it was too much. He reported the matter to the officers. Stevens, after returning home, was arrested and brought to trial. Hale, has

gone to the Federal penitentiary for some kind of money transaction.

Stevens cannot quite agree to the State's theory of this case. He said he was reared at Gilmer, in Upshur County, where he built and operated a steam laundry, which he conveyed to his wife, apparently divorced in 1935. He then moved to Mineola from which he operated principally as a gambler, but he did have some places of recreation, one at Palestine and one at Huntsville, where the jury says he must now take his recreation for the next two years to be re-created. Appellant was permitted to go into detail and tell the story of the poker game and declare his innocence as a true and honest gambler, by which he won $150.00 from Reid and $220.00 from the other two. However, Reid had agreed with the other two fellows to frame up on appellant to get his money, according to a defense witness. We note one strange variance in this witness' evidence which probably impressed the jury. Mr. Minshew, a citizen of Neches, himself a card artist, had taken a friend to Reid's chicken ranch and for fifty minutes had been trying to decide on a pair of game chickens to buy, when appellant came along, and after passing, backed up and stopped. Reid knew appellant and introduced Minshew and the other party to the appellant, who were strangers (?) with the result that the poker game referred to was organized, but Minshew probably inadvertently admitted more than once in his testimony that he had known appellant for two years, thus giving clear evidence to this miniature confidence game by which they involved Reid at poker.

Appellant then denies any intention to defraud on his part or any profit in the theft of the money by false pretext from Reid, but he does admit his introduction of Hale and the things that transpired much in the same way as detailed by Reid. He went to Dallas to see that man. He told Reid about the man and his prospective financial enterprise with him. He, too, was amazed but his $10,000.00, as he gives it, was not enough for a complete operation. He admits he engaged in assisting and encouraging Reid to get his money, even to the extent that he went with him to get the $4,000 out of the bank at Henderson on the check which Reid's mother gave. He states, in a general way, that he went to Dallas and tried to find the man who had stolen the money, but he did not engage any official assistance in the matter. He told the story of destroying the press or device used. He threw the boards in the ditch "because I didn't

want to get into any trouble if I could help it in any way." The facts are plain and clear. He had been charged with felonies before but not convicted. "The pitcher often to the fountain is broken." Appellant, in his story, does not go to the trouble of denying many of the things which the prosecuting witness said took place. He only substitutes a few of his figures and declares his innocence.

If we had no precedent for a story so fantastic, a story of gullibility beyond the imagination of an ordinary mind, we could hardly believe that the evidence should convict. Again and again such stories come to this court, but many of them never reach us because the parties are not apprehended and brought to trial. No question of law is raised for our consideration by this appeal save and except the sufficiency of the evidence to warrant the jury in returning a verdict finding the appellant guilty. It requires no thesis on the law of evidence to conclude that the facts amply justify the verdict of the jury.

The judgment of the trial court is affirmed.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

Much of appellant's motion is taken up with criticisms of the language employed in the original opinion herein, and the conclusions drawn therein. Much of his criticisms we fear are but hypercritical, and none of them can affect the final conclusion stated therein, that the testimony, taken as a whole, seemed to have convinced the jury, and also convinced us, that appellant, a seasoned and high-stakes gambler, not only won all the money of Reid and his over-confident friends in a poker game, but also lured the complaining witness into a confidence game that resulted in Reid losing the sum of $6,500.00.

No bills of exceptions are found in the record, and but one legal proposition is presented to us in this motion.

Appellant contends that under the statute denouncing a theft by false pretext, Art. 1413, P. C., the acquisition of the property obtained by such pretext should be for a lawful purpose, and that if the purpose of its acquisition from the complaining party was shown to be unlawful, then the possession

thereof by the accused would not be "by lawful means," and such statute would not be violated.

It is admitted, however, that this court, in the case of Lovell v. State, 48 Texas Crim. Rep. 85, upon motion for a rehearing, held that the purpose for which the property was obtained by false pretext, although such purpose might be an unlawful one, nevertheless an accused could not defend on the ground of such illegality. In this decision the consensus of opinion followed was that the punishment for crime is a matter in which society is primarily interested, and where both the complaning witness and the accused intended to violate the law, the crime of one should not be used to shield the other.

We think the phrase "by lawful means," contained in the statute, Art. 1413, supra, refers to the means by which the property came into the possession of the accused, and not to what the accused was expected or intended to do with such property. Such phrase would doubtless preclude a possession by violence or other unlawful means, but can not be extended to effect the purpose for which the property would be afterwards used.

The motion for a rehearing is overruled.